# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-KA-01573-SCT

*ROBERT D. SHERMAN a/k/a ROBERT SHERMAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/03/2012 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK, JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: MOLLIE MARIE MCMILLIN |
| | GEORGE T. HOLMES |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ELLIOTT GEORGE FLAGGS |
| | JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | RICHARD EARL SMITH, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/20/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KITCHENS AND COLEMAN, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Robert Sherman was indicted for willfully, unlawfully, and feloniously possessing pseudoephedrine and sodium hydroxide, two ingredients used in the manufacture of methamphetamine, with the unlawful intent to manufacture a controlled substance.[1] He was tried and convicted in the Warren County Circuit Court, then sentenced to twelve years in the custody of the Mississippi Department of Corrections, with eight years to serve and four years suspended, plus five years of post-release supervision. Sherman appeals, arguing that

---

[1]*See* Miss. Code Ann. § 41-29-313(1)(a)(ii) (Rev. 2013).

his conviction (1) was based upon insufficient evidence, or (2) was against the overwhelming weight of the evidence. We affirm Sherman's conviction and sentence.

**FACTS**

¶2.    The following facts are gleaned from the testimony of the several witnesses who testified at trial. On October 9, 2009, Dwayne Smith, a narcotics investigator for the Vicksburg Police Department, received a complaint regarding possible methamphetamine production at 4407 Halls Ferry Road in Vicksburg, Mississippi. He called Agent Norman Harris of the Mississippi Bureau of Narcotics to accompany him to the site of the alleged criminal activity. Smith testified that it was getting dark as the officers arrived around 7:30 or 8:00 p.m. Smith and Harris knocked on the door of the trailer at 4407 Halls Ferry Road, and the knock was answered by Sherman's girlfriend. The officers obtained her permission to search the trailer, but the search yielded nothing.

¶3.    Upon leaving the trailer, the officers saw two men, Sherman and Calvin Brewer, walking out of the woods about fifteen feet behind Sherman's trailer. Sherman was carrying a fishing pole and tackle box, and Brewer was holding a machete. The officers instructed Brewer to drop the machete, which he did. They patted him down, finding a marihuana grinder on his person. Brewer was placed in police custody.

¶4.    The officers began investigating the area around Sherman's trailer with the aid of a flashlight. Officer Smith found a bottle of liquid drain cleaner[2] near someone else's trailer in the general vicinity of the area where Sherman and Brewer had walked out of the woods.

---

[2]This kind of chemical product can be used as a precursor, or forerunner, of methamphetamine.

2

He acknowledged under cross-examination that the cleaner was not next to Sherman's trailer. The State's Exhibit 12 showed that the cleaner was found two trailers away from Sherman's, near the path on which the two men had walked out of the woods. The drain cleaner formed the basis for Sherman's sodium hydroxide, precursor possession charge. Officer Smith testified that drain cleaner can be used to manufacture crystal methamphetamine. According to Smith, when Harris showed the bottle of drain cleaner to Sherman, Sherman dropped his head and began to cooperate with the officers. Sherman agreed to show the officers where the meth lab was located and led them to a "cook site" near the edge of the woods. Smith testified that the cook site was "in some bushes, under some mud, probably about two feet buried in mud." Smith said that the visibility was poor and the officers would not have been able to find the cook site without Sherman's assistance.

¶5.     The "cook" itself was a plastic, two-liter Mountain Dew bottle, which Smith testified was used to make methamphetamine by means of the "shake-and-bake" method. He stated that the chemicals found in the bottle "had just been cooked" when they found it. As Sherman and the officers walked back from the cook site, toward Sherman's trailer, the officers noticed a black bag approximately fifteen to twenty feet away. Inside the bag was a box of pseudoephedrine, a known precursor of methamphetamine. Sherman was placed under arrest. Harris testified that another man on a motorcycle emerged from the woods several hundred yards away from the place at which the officers were interviewing Sherman. The man was never identified.

¶6.     Brewer testified for the State in exchange for a deal which resulted in his being placed in the drug court program. Brewer testified that, on the day the two were arrested, he had

been doing some electrical work for Sherman. The two men had made an arrangement by which Sherman would pay Brewer for working with him with methamphetamine. According to Brewer, he was to act as a decoy by fishing in the lake near the trailer park while Sherman and a man named James Hawkins[3] cooked the meth. He also testified that Sherman had possession of the black bag, in which the police later found pseudoephedrine, approximately thirty minutes before they were arrested. Brewer said Sherman had ditched the bag as he and Sherman were walking back to the trailer park, and Sherman was the last person Brewer had seen with the bag.

¶7. Sherman testified in his own defense. His version of events differs dramatically from the officers' testimony and Brewer's. Sherman denied leaving the black bag containing precursors in the woods, he denied possessing the bottle of drain cleaner, and he denied performing a "one-pot cook" at the cook site in question. According to Sherman, on the day he was arrested, he had been fishing in the pond behind the trailer park. He did not catch any fish, he said. On the way out of the woods, he ran into Brewer just before the two were arrested. Sherman denied having led the officers to the cook site, saying instead that he had been showing them where he had been fishing that day and, on the way, the officers had discovered the cook site and the black bag.

¶8. The jury found Sherman guilty, and he was convicted of having been in possession of precursor substances in violation of Mississippi Code Section 41-29-313(1)(a)(ii). Sherman filed a motion for judgment notwithstanding the verdict (JNOV), or, in the alternative, for a new trial. The trial court denied the motion, finding that sufficient evidence

---

[3]Hawkins was not arrested in connection with this crime.

was presented to the jury to convict Sherman, and that the verdict was not against the overwhelming weight of the evidence. Sherman was sentenced to twelve years in the custody of the Mississippi Department of Corrections, with eight years to serve and four years suspended, and five years of post-release supervision. Sherman appeals, arguing that his motion for JNOV or new trial should have been granted, claiming that there was insufficient evidence at trial to support a conviction, or, in the alternative, his conviction was against the overwhelming weight of the evidence.

## ANALYSIS

**1. Whether the trial court erred in denying Sherman's motion for JNOV because the evidence presented against him was insufficient to support a conviction.**

¶9. When reviewing the sufficiency of the evidence against an accused in the face of a motion for JNOV, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶ 16) (Miss. 2005). If "reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense, the evidence will be deemed to have been sufficient." *Id.* (quotation omitted).

¶10. Section 41-29-313(1)(a)(ii), the code section Sherman was charged with violating, provides:

> (1)(a) Except as authorized in this section, it is unlawful for any person to knowingly or intentionally:
> . . .
> (ii) Purchase, possess, transfer, manufacture, attempt to manufacture or distribute any two (2) or more of the listed precursor chemicals or drugs in any

amount, knowing, or under circumstances where one reasonably should know, that the listed precursor chemical or drug will be used to unlawfully manufacture a controlled substance[.]

Miss. Code Ann. § 41-29-313(1)(a)(ii) (Rev. 2013). Sherman was charged with possessing pseudoephedrine and sodium hydroxide with the unlawful intent to manufacture a controlled substance. Both pseudoephedrine and sodium hydroxide are listed as precursor chemicals. *See* Miss. Code Ann. § 41-29-313(1)(b)(iv)-(xiv) (Rev. 2013).

¶11.    The jury was instructed that, for it to find Sherman guilty of possession of precursors:

> [T]here must be sufficient facts to warrant a finding beyond a reasonable doubt that the defendant was aware of the character and presence of the precursor substances and was intentionally and consciously in possession of the precursor substances. It need not be actual physical possession. Constructive possession may be shown by establishing that the precursor substances were subject to the defendant's dominion or control.

### A.    The Pseudoephedrine

¶12.    "A presumption of constructive possession arises against the owner of premises upon which contraband is found." *Cunningham v. State*, 583 So. 2d 960, 962 (Miss. 1991). Sherman argues that he did not own the property on which the black bag containing the pseudoephedrine pills was located, and that the State had failed to rebut the presumption that the owner of the property constructively possessed the precursor. He argues that Brewer's testimony linking him to the black bag was inconsistent and had been given in return for a lenient resolution of the charge against Brewer.

¶13.    The State responds that competent evidence connected Sherman to the black bag in which the pseudoephedrine was found. Brewer testified that, thirty minutes prior to Sherman's arrest, the bag was in Sherman's physical possession and that he had ditched it

6

in the woods. We agree that the State adduced sufficient evidence to connect Sherman to the pseudoephedrine in the black bag. The State offered testimony showing that Sherman was "aware of the presence and character of the [pseudoephedrine] and was intentionally and consciously in possession of it." *Johnson v. State*, 81 So. 3d 1020, 1023 (¶ 7) (Miss. 2011) (quoting *Curry v. State*, 249 So. 2d 414, 416 (Miss. 1971)). The evidence, although disputed by Sherman, was sufficient to show that Sherman constructively possessed the pseudoephedrine pills in the black bag. In fact, if one believes Brewer, the evidence showed that Sherman *actually* had possessed the bag.

### B. The Drain Cleaner

¶14. The bottle of drain cleaner, which contained the precursor sodium hydroxide, was found near the area of the woods from which Sherman and Brewer emerged prior to their arrests. Officer Smith admitted on cross examination that the drain cleaner was not found next to Sherman's trailer, but someone else's. Agent Harris marked the drain cleaner as having been found near a trailer near the wooded area from which Brewer and Sherman had emerged. The cleaner was found in close proximity to the point at which the two men had emerged, next to a trailer that was two trailers away from Sherman's residence. There is no evidence of an acknowledgment by Sherman that the drain cleaner was his. Brewer never testified about it. The investigating officers testified that, when confronted with the bottle, Sherman had hung his head and asked Harris whether the officer would help him out if he agreed to show the police where "the cook" was. Harris testified about what happened when he told Sherman that the officers were there to investigate a complaint regarding meth manufacturing in the area.

7

Q: And did he say anything at all?
A: Basically, he told me, they were out there fishing. He was – had a fishing pole and a tackle box and they were out there fishing and there wasn't anything going on.
Q: And what were the other agents and officers doing while you were talking to him?
A: They were then searching the area where they saw them coming from.
Q: And was anything of evidentiary value found at that time?
A: Investigator Smith retrieved a bottle of liquid draino [sic].
. . .
Q: Did you relay that information that you found a precursor substance to Robert Sherman?
A: I did.
Q: And did he admit to you to having a meth cook at that time?
A: He did not but we did continue to talk and he later told me that; Mr. Harris, help me out and I will show where the lab is.

¶15. Officer Smith also testified about Agent Harris's confronting Sherman with the bottle of drain cleaner.

Q: Okay, did Agent Harris, when presented with [the bottle of drain cleaner], present that evidence to the Defendant, Robert Sherman?
A: Yes, sir.
. . .
Q: And you were standing there with your eyes and you saw Agent Harris present this, how did you see the Defendant react when presented with this precursor substance?
A: Once it was presented, shown the precursor, he dropped his head.
Q: Okay. At that point, I guess, did his cooperativeness change?
A: Yes. He was totally being cooperative at that time.

¶16. At no point did Sherman affirmatively admit that he owned or possessed the drain cleaner with which the police confronted him. Sherman was linked to the drain cleaner, and the sodium hydroxide precursor it contained, by testimony that it was found near the location where Sherman had emerged from the woods (although on another's property), and that Sherman immediately had dropped his head and started cooperating with police after being confronted with it by leading them to the cook site near the location of the bag containing the

8

pseudoephedrine. The issue before us is whether the State presented sufficient evidence and incriminating circumstances to support a conviction of constructive possession of the drain cleaner.

¶17.    For one to be in constructive possession, "there must be sufficient facts to warrant a finding that defendant was aware of the presence and character of the particular substance and was intentionally and consciously in possession of it." *Johnson*, 81 So. 3d at 1023 (¶ 7) (quotation omitted). "Proximity is usually an essential element, but by itself is not adequate in the absence of other incriminating circumstances." *Curry*, 249 So. 2d at 416. In *Johnson*, the defendant was convicted of constructively possessing cocaine. *Johnson*, 81 So. 3d at 1022 (¶ 5). The Mississippi Bureau of Narcotics had been conducting a sting operation at a convenience store. *Id.* (¶ 3). The agents used an informant to purchase drugs from a known drug dealer in the area. *Id.* After the informant obtained the drugs, the agents sped to the scene. *Id.* When they arrived, Johnson was standing next to a car that had not been at the scene when the drug deal had occurred. *Id.* (¶ 4). Johnson had not been on the scene when the drug deal had occurred. *Id.* The agents noticed Johnson speaking with a man in the car and arrested both of them. *Id.* A search of the car revealed 0.7 grams of cocaine under the driver's-side visor. *Id.* Johnson was arrested for constructively possessing the cocaine found in the car. *Id.* No evidence was presented indicating that Johnson had owned or driven the car. *Id.* at 1024 (¶ 11). After his conviction, Johnson challenged the sufficiency of the evidence convicting him of possession of cocaine. *Id.* at 1021 (¶ 1). This Court overturned his conviction, finding that the State did not "prove the defendant was aware of the cocaine and intentionally possessed it." *Id.* at 1026 (¶ 22). Ultimately, this Court held that "Johnson's

9

location near the vehicle, absent additional incriminating circumstances, is not sufficient to sustain his conviction of constructive possession." *Id.* (¶ 23) (quotation omitted).

¶18.     Here, the drain cleaner was found near where Sherman and Brewer came out of the woods. Under *Johnson*, absent any other incriminating circumstances, the proximity to the precursor alone indeed may not have been sufficient evidence to show constructive possession. However, we find that there were additional incriminating circumstances which, in combination with Sherman's proximity to the drain cleaner, were sufficient to support a jury finding that Sherman constructively possessed the drain cleaner. Testimony was adduced that Sherman instantly began cooperating with investigators when shown the drain cleaner. Sherman's willingness to show the officers the cook site after being confronted with the drain cleaner could be interpreted to mean that Sherman knew the drain cleaner was his and that he intended to use it in the manufacture of methamphetamine. Further, the officers did find a meth cook site in the woods, near a bag that contained another precursor which Brewer testified belonged to Sherman.

¶19.     Looking at the evidence in the light most favorable to the State, we find that a reasonable jury could have found beyond a reasonable doubt that Sherman constructively possessed the drain cleaner. His proximity to the drain cleaner, combined with the accompanying incriminating circumstances of the meth cook site and Brewer's testimony, provide sufficient evidence to support the jury's guilty verdict.

   **2.      Whether the trial court erred in denying Sherman's motion for new trial, as the overwhelming weight of the evidence supported a finding that Sherman was not guilty.**

10

¶20. "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." **Bush**, 895 So. 2d at 844 (¶ 18). The Court must view the evidence in the light most favorable to the verdict, and if it disagrees with the verdict, the proper remedy is to grant a new trial. **Id.**

¶21. Sherman argues that there is a lack of evidence showing that he actually possessed the two precursor substances. He also argues that the officers failed to eliminate other potential suspects by failing to apprehend or identify the man on the motorcycle who appeared at the edge of the woods during Sherman's interview. Sherman posits that this man could have been the possessor of the black bag. We disagree. Brewer testified that Sherman had been cooking methamphetamine at the cook site before the two were arrested, and that he had possessed the black bag containing the pseudoephedrine pills. Smith and Harris testified that Sherman had agreed to show them the cook site after they confronted him with the drain cleaner, and the officers did actually find a cook site with his assistance. Brewer testified that the fishing equipment was used merely as a decoy in an effort to fool any suspicious parties, countering Sherman's testimony that he had merely been fishing. Sherman's testimony was vastly different from that of Brewer and the police; but it was up to the jury to determine whether the State sufficiently proved that Sherman had possessed the precursors constructively. Further, the jury was made aware of the presence of the man on the motorcycle and a potential third actor. It was for the jury to decide whether this was relevant. The jury resolved these factual issues against Sherman, and we cannot say that his conviction was against the

11

overwhelming weight of the evidence when viewing the evidence in the light most favorable to the verdict, nor would our upholding the verdict sanction an "unconscionable injustice." The trial court did not err in denying Sherman's motion for a new trial.

## CONCLUSION

¶22. The State presented sufficient evidence to support a conviction, and the conviction was not against the overwhelming weight of the evidence. The conflicting evidence was weighed by the jury, and the jury found against Sherman. The trial court did not err when it denied Sherman's motion for JNOV or a new trial. Accordingly, Robert Sherman's conviction and sentence for possession of precursors are affirmed.

¶23. **CONVICTION OF POSSESSION OF PRECURSORS WITH INTENT TO MANUFACTURE METHAMPHETAMINE AND SENTENCE OF TWELVE (12) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH EIGHT (8) YEARS TO SERVE AND FOUR (4) YEARS SUSPENDED, WITH FIVE (5) YEARS OF POST-RELEASE SUPERVISION, WITH CONDITIONS, AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., LAMAR, PIERCE AND COLEMAN, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND KING, JJ.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶24. The majority believes the State introduced sufficient evidence for the jury to find Sherman in constructive possession of a can of drain cleaner that police found. But Sherman was not found in close proximity to the drain cleaner, and no evidence whatsoever connected Sherman to the drain cleaner, so I respectfully dissent.

## ANALYSIS

**Sherman was not in close proximity to the drain cleaner.**

12

¶25. The majority never says Sherman was in close proximity to the drain cleaner. Police interviewed Sherman on his property. They later found the drain cleaner in what they described as the "general vicinity" of where they had observed Sherman walk out of the woods, carrying a fishing pole and tackle box. The officers never suggested that they saw Sherman toss or hide the drain cleaner.

¶26. Furthermore, when the police officers saw Sherman walk out of the woods, he was approximately fifteen feet from his trailer. They later found the drain cleaner two trailers away from Sherman's trailer. So, unless one presumes that a person who is fifteen feet away is in close proximity to drain cleaner that is two mobile homes away (few, if any, mobile homes are only seven feet wide) Sherman was not in close proximity to the drain cleaner.

**No evidence connected Sherman to the drain cleaner.**

¶27. Even if one accepts the majority's position that "in the vicinity" equals close proximity, our precedent clearly requires more. The majority correctly observes that, while proximity is an essential element, it is "not adequate in the absence of other incriminating circumstances."[4] The majority says there is more, but, after scrutinizing the record, I am unable to find it.

¶28. The majority says that Sherman – when confronted with the drain cleaner – hung his head and began to cooperate. In reading the majority's characterization of this event, one might conclude that, upon being confronted with the drain cleaner that was found two trailers

---

[4]*Curry v. State*, 249 So. 2d 414, 416 (Miss. 1971).

13

away, Sherman immediately hung his head in shame and led the officers to the meth lab. This characterization is at odds with Officer Harris's testimony.

¶29.	When asked whether Sherman, upon being confronted with the drain cleaner, admitted wrongdoing, Officer Harris testified: "He did not but we did continue to talk and *he later told me* that Mr. Harris, help me out and I will show where the lab is." This testimony hardly establishes cause and effect, that is to say, it hardly proves that the drain cleaner is what caused Sherman *later* to cooperate.

¶30.	Also, there is the absence of any testimony from Brewer connecting Sherman to the drain cleaner. In exchange for his testimony against Sherman, Brewer pleaded guilty and was given a favorable deal. Even so, he never connected Sherman to the drain cleaner. And because, in exchange for his deal, he was required to cooperate with the State in its case against Sherman, he certainly would have tied Sherman to the drain cleaner if he could have.

**CONCLUSION**

¶31.	Given that Sherman was not in close proximity to the drain cleaner; that he never admitted that the drain cleaner was his; that no evidence tied him to it; and that the State's star witness did not testify that the drain cleaner was Sherman's, I simply cannot agree that the State presented sufficient evidence for a jury to find – beyond a reasonable doubt – that Sherman was in constructive possession of the drain cleaner. For these reasons, I respectfully dissent.

**CHANDLER AND KING, JJ., JOIN THIS OPINION**.